**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| FREEDOM FOREVER LLC, | Case No. 26-10522 (BLS) |
| Debtors.[1] | |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTOR TO (A) PAY CERTAIN PREPETITION
EMPLOYMENT OBLIGATIONS AND (B) MAINTAIN EMPLOYEE
BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "Debtor") respectfully

moves (the "Motion") as follows:

**RELIEF REQUESTED**

1.      The Debtor seeks entry of interim and final orders, substantially in the

forms attached hereto as **Exhibit A** (the "Interim Order") and **Exhibit B** (the "Final Order" and,

together with the Interim Order, the "Proposed Orders"), authorizing but not directing the

Debtor, in its discretion, to: (i) pay all prepetition wages, salaries, commissions and

compensation to Employees (as defined below) and independent authorized dealers ("IADs"),

and all related administrative and incidental costs (all as described below and, collectively, the

"Compensation Obligations") and prepetition Employee benefits (all as described below and,

collectively, the "Employee Benefit Obligations"); (ii) pay all employment, unemployment,

social security, and federal, state, and local taxes relating to the Compensation Obligations and

Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtor to

governmental authorities, and make other payroll deductions, including, but not limited to,

retirement and other employee benefit plan contributions, and voluntary deductions (all as

---

[1]     The Debtor in this case, along with the last four digits of its's federal EIN, is Freedom Forever LLC (8857). The Debtor's mailing address is 43445 Business Park Drive Suite 110 Temecula, CA.

described below and, collectively, the "Employer Tax and Payroll Deduction Obligations" and, collectively with the Compensation Obligations and Employee Benefit Obligations, the "Prepetition Workforce Obligations"); and (iii) honor and continue the Debtor's and its non-debtor subsidiaries' prepetition programs, policies and practices as described in this Motion in the ordinary course of business (the "Compensation and Benefits Programs").  In support of this Motion, the Debtor respectfully represents as follows:

**JURISDICTION AND VENUE**

2.    The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over this chapter 11 case and this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this case and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    Pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtor consents to the entry of a final order with respect to this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.    The statutory bases for the relief requested herein are sections 105(a), 363(b), 507(a)(8) and 541 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"), as supplemented by rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 9013-1(m).

**BACKGROUND**

5.      On April 15, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtor is operating its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee has been appointed in this case.

6.      The Debtor is one of the nation's largest residential solar installation enterprises—building, staffing, and scaling a comprehensive platform that serves homeowners across the country.

**THE DEBTOR'S WORKFORCE**

7.      The Debtor is headquartered in Temecula, California but serves homeowners in 30 plus states with employees working in-person and remotely in locations spread across the country.  Within the past 12 months, the Debtor and its non-debtor subsidiaries (the "Company") employed approximately 1,374 hourly employees and 416 salaried employees.  Approximately 1,668 employees were furloughed over the past few months.  As of the Petition Date, the Debtor and its non-debtor subsidiaries employ 122 full-time employees (the "Employees"), of which 27 are employed directly by the Debtor.

8.      In addition to the Employees, the Company has historically supplemented its workforce using a network of independent contractors or independent authorized dealers ("IADs," and together with the Employees, the "Workforce"),[2] which are independent solar sales organizations and sales representatives that market, contract, and coordinate the installation of residential solar energy systems on the Company's behalf.

---

[2]    As used herein, "Independent Authorized Dealers" or "IADs" refers to the network of independent companies and individuals that market, sell, and contract residential solar installations on behalf of Freedom Forever.

3

9.      Unlike traditional solar companies that employ large direct sales forces, the Company operates as an engineering, procurement, and construction platform that empowers the IADs with proprietary technology, in-house installation capacity, and back-end financing access.   The Company's proprietary software platform provides IADs, homeowners, and Company personnel with real-time project visibility, permitting support, and customer-facing transparency throughout the solar installation lifecycle.

10.      The Company's Employees perform a variety of critical functions including solar installation, project management and permitting, as well as various back-office functions that support the IADs and the Company's day-to-day engineering, procurement and construction platform, including legal, human resources, information technology, and general administrative back-office functions.

11.      The Company's ability to run its business safely and productively depends entirely on the expertise and continued support and service of its Workforce.   Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtor believes that the continuity and competence of its workforce would be jeopardized if the relief requested herein is not granted.   Moreover, if the Debtor fails to pay the Prepetition Workforce Obligations in the ordinary course of business, its Workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.   This would have a highly negative impact on morale and productivity and would risk immediate and irreparable harm to the Debtor's continuing operations and its estate.   Accordingly, the Debtor has determined that paying these obligations and continuing all the compensation and benefits programs described in this Motion is vital to preventing the loss of key members of the Workforce during the pendency of this chapter 11 case and to maintaining the continuity and stability of the Debtor's operations.

Below is a summary table of the Debtor's Prepetition Workforce Obligations, which are each described in detail herein:

| Category | Approximate Interim Amount | Approximate Final Amount |
|---|---|---|
| **I.  Compensation Obligations** | | |
| Net Wages | $5,000,000.00 | $5,000,000.00 |
| IAD Fees | $7,000,000.00 | $7,000,000.00 |
| **II. Employer Tax Obligations and Payroll Deduction Obligations** | | |
| *This category includes employer taxes and deductions/withholdings for payments to third parties on behalf of the Debtor's employees for various federal, state and local income, employment, payroll, and other taxes, as well as for retirement and savings programs and health, welfare, and employee benefit programs/plans. | $1,500,000.00 | $3,500,000.00 |
| **III.    Employee Benefit Obligations** | | |
| Paid and Unpaid Leaves of Absence | $6,500,000.00 | $6,500,000.00 |
| Expense Reimbursement | $100,000.00 | $100,000.00 |
| Medical, Dental, and Vision Plans | $1,900,000.00 | $1,900,000.00 |
| FSA & HSA (Administrator Fee) | $3,000.00 | $3,000.00 |
| Life, AD&D, and Disability Insurance | $70,000.00 | $70,000.00 |
| Other Welfare Programs | $1,060,000.00 | $1,060,000.00 |
| Workers' Compensation | $210,000.00 | $210,000.00 |
| **Total Prepetition Workforce Obligations** | **$23,343,000.00** | **$25,353,000.00** |

I.      **Compensation Obligations**

A.      **Employee Wages & IAD Fees**

12.     Employees are paid their wages or salaries (collectively, the "Employee Wages") on account of their services to the Company on a bi-weekly basis Monday to Sunday (and weekly in the state of New York) with the last payroll cycle running from March 30, 2026, through and including April 12, 2026.  Over the past twelve (12) months, the average gross payroll for Employees aggregated approximately $13 million and the average

fees/expenses/commissions charged by the IADs (the "IAD Fees") aggregated approximately $12 million.  The next scheduled payroll disbursement is April 17 for the payroll period running from March 30 through April 12.  The Debtor also incurred prepetition Compensation Obligations on April 13 and 14 ahead of the April 15 Petition Date.  Accordingly, the Debtor owes Employees and IADs accrued but unpaid Compensation Obligations as of the Petition Date.  Compensation Obligations also may be due as of the Petition Date for a variety of reasons, such as Employees or IADs holding issued but uncashed paychecks.  The Debtor estimates that as of the Petition Date, the total amount of outstanding prepetition Employee Wages is approximately $5 million and outstanding IAD Fees is approximately $7 million, all of which will come due in the first 21 days of this case.

B.      **Payroll Processing Services**

13.     The Debtor processes payroll in-house without a third-party administrator, which includes calculating and processing gross-to-net payroll, issuing payroll payments to the appropriate funds transfer networks, generating pay statements and coordinating the payment of any deductions or other applicable withholdings.  Accordingly, the Debtor does not owe any payroll processing services fees to any third-party administrator as of the Petition Date.

II.     **Employer Tax and Payroll Deduction Obligations**

14.     In the ordinary course of business, the Debtor pays various federal, state and local employer payroll and unemployment taxes, and takes certain deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state and local income, employment, payroll, and other taxes, as well as for retirement and savings programs and health and welfare plans (collectively, the "Employer Tax and Payroll Deduction Obligations").  Over the past twelve (12) months, the Debtor's average monthly Employer Tax and Payroll Deduction Obligations for Employees aggregated approximately $3.5

6

million.  As of the Petition Date, the Debtor estimates that for its most recent payroll cycle, the Debtor's tax and withholding/deduction obligations are approximately $1.5 million[3] on account of Employer Tax and Payroll Deduction Obligations.  Pursuant to this Motion, the Debtor seeks authority to continue to pay and/or withhold amounts on account of the Employer Tax and Payroll Deduction Obligations and to transfer such amounts to the administrator in the ordinary course of business, as applicable.

### III.    Employee Benefits Programs

#### A.    Paid and Unpaid Leaves of Absence

15.    The Debtor maintains several paid leave benefit programs for its Employees, providing paid leave for personal time off ("PTO"), holidays, sick leave, bereavement, etc. (collectively, the "Paid Leave").  Specifically, PTO days were historically calculated based on the Employee's length of service with the Debtor since his or her hire date, and PTO would carry forward into the next year up to a maximum accrued amount based upon years of service with the Debtor.  The Debtor estimates that as of the Petition Date, the total amount of outstanding prepetition Paid Leave obligations is approximately $6.5 million.  Failure to honor accrued Paid Leave as it comes due in the ordinary course could harm morale and encourage premature attrition.  The Debtor therefore requests authority to continue its Paid Leave program and honor any prepetition accrued Paid Leave obligations when they come due to the extent any amounts are due and payable under applicable law.  This accrued Paid Leave obligation is not a current cash payment obligation.

#### B.    Expense Reimbursement

---

[3]    Any reference to an employee withholding amount described below is already accounted for in the aggregate $1.5 million sum for all Employer Tax and Payroll Deduction Obligations.

16.    The Debtor, in the ordinary course of business, reimburses Employees for a variety of ordinary, necessary, and reasonable business-related expenses that the Employees incur on behalf of the Debtor in the scope of their employment (the "Reimbursable Expenses"). While the Debtor has issued employer credit cards in the past, most Employees initially incur and pay such Reimbursable Expenses by using personal funds, and are subsequently reimbursed by the Debtor after submission and approval of expense reimbursement reports. Employees are expected to use sound judgment and good business sense when incurring such expenses, and the Debtor reserves executive approval to accept or deny repayment of all requested Reimbursable Expenses. The Debtor estimates that, as of the Petition Date, approximately $100,000.00 may be owed on account of prepetition Reimbursable Expenses all of which will come due in the first 21 days of this case.

C.    **Health and Welfare Benefits**

17.    The Debtor offers its eligible Employees a large portfolio of benefits, including medical, dental coverage, vision coverage, health savings accounts, coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), flexible spending accounts, life insurance, accidental death and dismemberment insurance, disability insurance, an employee assistance program, and other benefit programs provided to Employees in the ordinary course of business (collectively, and as listed in detail below, the "Health and Welfare Benefits"). Further details for each program are provided below:

1.    **Medical, Dental, and Vision Benefits**

18.    The Debtor offers for all eligible Employees and their spouses and dependents medical, dental, and vision coverage (the "Medical, Dental, and Vision Plans"), each of which is administered through United Healthcare.

8

19.     Over the past twelve (12) months, the Debtor's monthly obligation under the Medical Plans was $670,870.71 to cover outstanding claims and fees associated with the Medical, Dental, and Vision Plans.  As of the Petition Date, the Debtor estimates that approximately $1,900,000.00 (for March and April) has accrued in obligations under the Medical, Dental, and Vision Plans.

### 2.     Flexible Spending Accounts

20.     In addition to offering the medical, dental, and vision benefits described above, the Debtor offers Employees the option to enroll in certain flexible spending accounts (the "Flexible Spending Accounts"), managed by Wex Health (in such capacity, the "Flexible Spending Accounts Administrator").  Participating Employees can make pre-tax payroll contributions (the "Flexible Spending Account Contributions") to the Flexible Spending Accounts up to the maximum amounts permitted by the Internal Revenue Service.  Employees then may use the proceeds of Flexible Spending Accounts to cover the cost of eligible expenses incurred by such Employee and their dependents, depending on the Flexible Spending Account in which they are enrolled.  Employees who participate in the Flexible Spending Accounts may use such proceeds by, among other means, utilizing a designated debit card provided to participating Employees or submitting claims for reimbursement.

21.     Approximately 352 Employees were/are enrolled in the Debtor's FSA Plan.  Over the past twelve (12) months, the Debtor withheld, on average, approximately $8,000.00 per month from Employees' compensation on account of the Flexible Spending Account Contributions.  As of the Petition Date, the Debtor estimates that it is currently holding approximately $8,000.00 on account of the Flexible Spending Account Contributions.  Pursuant to this Motion, the Debtor seeks authority to continue to withhold amounts on account of the

Flexible Spending Account Contributions and to transfer such amounts to the Flexible Spending Accounts Administrator in the ordinary course of business.

22.    In addition, over the past twelve (12) months, the Debtor paid, on average, approximately $3,000.00 per month in administrative fees to the Flexible Spending Accounts Administrator.  The Debtor estimates that, as of the Petition Date, it owes no more than[4] $3,000.00 in administrative fees to the Flexible Spending Accounts Administrator, all of which will come due in the first 21 days of this case.

### 3.    Health Savings Account

23.    All Employees may elect to participate in the Debtor's tax-advantaged health savings account (the "HSA Plan") also administered by Wex Health, under which the Debtor offers eligible Employees the ability to contribute a portion of their pre-tax compensation to a health savings account to pay for qualified out-of-pocket health care expenses for the Employee and qualified dependents.  Employees who elect to participate in the HSA Plan designate a certain amount per paycheck to be withheld from their payroll as a deduction. Approximately 302 Employees were/are enrolled in the Debtor's HSA Plan.  Over the past twelve (12) months, the Debtor withheld, on average, approximately $21,000.00 per month from Employees' compensation on account of employee contributions to the HSA Plan.  As of the Petition Date, the Debtor estimates that it is holding approximately $10,000.00 on account of employee contributions to the HSA Plan.  Pursuant to this Motion, the Debtor seeks authority to continue to withhold amounts on account of the HSA Plan and to transfer such amounts to the administrator, Wex Health, in the ordinary course of business.

---

[4]    Wex Health is the administrator for the Debtor's HSA Plan and this administrative fee covers it services for administering both the HSA Plan and the FSA Plan.

**4.      Life, AD&D, and Disability Insurance**

24.      The Debtor provides all eligible Employees with basic life insurance, basic accidental death and dismemberment ("AD&D") insurance, and short and long-term disability insurance coverage through United Healthcare in the event of serious illness, injury or death.   Over the past twelve (12) months, these policies cost the Debtor approximately $80,000.00 per month on average.   As of the Petition Date, the Debtor believes that approximately $70,000.00 remains outstanding for prepetition obligations related to the Debtor's obligations under these policies, all of which will come due in the first 21 days of the case.

**6.      COBRA Coverage and Other Welfare Programs**

25.      In addition to the foregoing, the Debtor has in place miscellaneous practices, programs, and policies that provide medical and welfare benefits to eligible Employees, including COBRA, a pre-tax commuter transportation and parking program administered by Wex Health,[5] an employee assistance program for counseling, and other various employee wellness programs (collectively, the "Other Welfare Programs").   The Debtor believes that the Other Welfare Programs are important to maintaining morale and assisting in the retention of the Debtor's Workforce.   The approximate amount accrued under the Other Welfare Programs as of the Petition Date is $1,060,000.00, all of which will come due in the first 21 days of this case.

**D.      Workers' Compensation**

26.      The Debtor maintains workers' compensation insurance (the "Workers' Compensation Program"), under its policy with National Casualty Company, a Nationwide

---

[5]      The Debtor offers a subsidized commuter program in which it pays for parking or provides transit commuter assistance.   Approximately 13 Employees are enrolled in transition services and 13 are enrolled in parking services.

Company (the "Workers' Compensation Insurer") that covers workers' compensation claims.[6] The Debtor pays an annual premium in connection with the Workers' Compensation Program of approximately $1,374,971.00 based upon a fixed rate established and billed by the Workers' Compensation Insurer (the "Workers' Compensation Insurance Premium").  As of the Petition Date, the Debtor estimates that approximately $210,000.00 remains outstanding on its Workers' Compensation Insurance Premium.[7]

### E.      Employee Retirement Benefits

27.      The Debtor maintains a qualified defined contribution savings plan for the benefit of its current and retired Employees (the "401(k) Plan"), which is designed to meet the requirements of sections 401(a) and 401(k) of title 26 of the United States Code.  The 401(k) Plan is administered by Empower.  Approximately 278 Employees were/are enrolled in the 401(k) Plan and contribute approximately $231,905.30 per month to their respective 401(k) Plans.  The Debtor estimates that for the most recent pay period running through April 12, the Debtor owes approximately $90,000.00 in 401(k) employee contribution withholding obligations and $6,000.00 in 401(k) loan deductions.  The Debtor does not match contributions made by Employees.

### BASIS FOR RELIEF

**I.      Payment of the Prepetition Workforce Obligations Is a Sound Exercise of the Debtor's Business Judgment and Is Appropriate Under Sections 363 and 105(a) of the Bankruptcy Code.**

28.      Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

---

[6]    Employees based in Ohio are covered under a state-sponsored plan.

[7]    The Debtor intends to file a separate insurance motion seeking authorization to continue honoring its other insurance programs in the ordinary course.

business, property of the estate."  11 U.S.C. § 363(b)(1).   Under section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose justifies such actions."  *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987); *see also, e.g.*, *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2003 WL 22316543, at *31 (Bankr. S.D.N.Y. Mar. 4, 2003); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007); *In re Dana Corp.*, 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006).

29.    In addition to being justified under section 363(b)(1) of the Bankruptcy Code, payment of the Prepetition Workforce Obligations is warranted under the doctrine of necessity.  Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a) and the "doctrine of necessity," the Court may exercise its broad grant of equitable powers to permit the payment of Prepetition Workforce Obligations when such payment is essential to the continued operation of the debtor's business.  *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of

13

necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtors' survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (confirming that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to the confirmation of a reorganization plan).

30.     The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981).  The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor.  *Id.* (stating that a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also Official Comm. of Unsecured Creditors of Motor Coach Indus. Int'l, Inc. v. Motor Coach Indus. Int'l, Inc. (In re Motor Coach Indus. Int'l, Inc.)*, No. 08-12136-BLS, 2009 WL 330993, at *3 (D. Del. Feb. 10, 2009) (denying stay pending appeal on grounds that doctrine of necessity had not been brought into serious question by courts in Third Circuit).

31.     The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy of Chapter 11."  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition workers' compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately");

*In re Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("A general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process").  Moreover, Bankruptcy Rule 6003 itself implies that the payment of Prepetition Workforce Obligations may be permissible within the first 21 days of a case where doing so is "needed to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.

32.    It is a sound exercise of the Debtor's business judgment to seek the authority, but not the direction, to pay the Prepetition Workforce Obligations because doing so will help the Debtor avoid the potential for value-destructive interruption to its business operations during this chapter 11 case.  For the reasons discussed herein, authority to pay the Prepetition Workforce Obligations enhances value for the benefit of all interested parties.  The Debtor's ability to maximize value and continue operations depends, in large part, on the retention, motivation and productivity of its workforce, whose efforts will be critical to the Debtor's successful reorganization.  Most of the Debtor's Workforce rely exclusively on the Prepetition Workforce Obligations to satisfy their daily living expenses.  If amounts owed are not received or other benefits are delayed, the workforce may be exposed to significant financial hardship and, in some cases, will be unable to meet their basic needs, which may make continuing to work for the Debtor impossible.  If the Debtor is unable to satisfy its various

15

compensation and benefits obligations, the Workforce will suffer at a time when their support is critical to the Debtor.   Therefore, in order to provide certainty to the Debtor's Workforce, maintain morale and productivity, limit turnover and minimize the adverse effect of the commencement of this chapter 11 case, the Debtor seeks the authority, but not the direction, to continue providing ordinary course compensation and benefits.

33.      Indeed, courts in this district have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested here.  *See, e.g., In re Town Sports Int'l, LLC*, No. 20-12168 (CSS) (Bankr. D. Del. Sept. 16, 2020) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re Extraction Oil and Gas, Inc.*, No. 20-10548 (Bankr. D. Del. July 13, 2020) (same); *In re APC Automotive Technologies Intermediate Holdings*, LLC, No. 20-11466 (CSS) (Bankr. D. Del. June 4, 2020) (same); *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2020) (same); *In re Bluestem Brands, Inc.*, No. 20-10566 (MFW) (Bankr. D. Del Mar. 30, 2020) (same).   Accordingly, the Debtor respectfully requests that the Court authorize the Debtor to pay Prepetition Workforce Obligations and continue the Compensation and Benefits Programs in the ordinary course of business and consistent with past practice.

## II.    Payment is Required of Certain of the Prepetition Workforce Obligations as Priority Claims.

34.      The Debtor believes that the majority of the Prepetition Workforce Obligations constitute priority claims under sections 507(a)(4), (a)(5) and (a)(8) of the Bankruptcy Code, which must be satisfied before any general unsecured claims against the Debtor's estate.  *See* 11 U.S.C. §§ 507(a)(4), 507(a)(5), 507(a)(8), 726.   Specifically, under section 507(a)(4)(A) of the Bankruptcy Code, claims of employees for "wages, salaries, or

commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status up to $17,150 per individual. *See* 11 U.S.C. § 507(a)(4)(A).

35. Similarly, under section 507(a)(5) of the Bankruptcy Code, employees' claims for contributions to certain employee benefit plans are also afforded priority unsecured status up to $17,150 per employee covered by such plan, less any amount paid under section 507(a)(4). *See* 11 U.S.C. § 507(a)(5)(A).

36. Accordingly, the Debtor requests entry of the proposed Interim Order authorizing, but not directing, the Debtor to pay the Prepetition Workforce Obligations in an aggregate amount not to exceed the cap in the Interim Order, followed by the final hearing on this Motion authorizing the Debtor in its business judgment to continue paying and/or honoring Prepetition Workforce Obligations and Compensation and Benefits Programs in the ordinary course whether arising pre- or postpetition.

III. **Applicable Financial Institutions Should Be Authorized and Directed to Receive, Process, Honor, and Pay Checks Issued and Transfers Requested to Pay Prepetition Workforce Obligations.**

37. The Debtor further requests that the Court authorize and direct applicable financial institutions (the "Banks") to receive, process, honor, and pay any and all checks issued or to be issued, and electronic funds transfers requested or to be requested on the Debtor's bank accounts to pay prepetition obligations described herein, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments. The Debtor further requests that the Court authorize the banks and financial institutions to rely on the Debtor's designation of any particular check or electronic payment request as approved pursuant to this Motion. The Debtor also seeks authority to issue new postpetition checks or effect new electronic fund transfers, on account of

the Prepetition Workforce Obligations or to replace any prepetition checks or electronic fund transfer requests that may be dishonored or rejected as a result of the commencement of the Debtor's chapter 11 case.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

38. Bankruptcy Rule 6003 empowers the Court to issue an order, within 21 days after the Petition Date, granting a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the petition was filed" if such requested relief "is needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(a). For the reasons discussed above, entry of an interim order granting this Motion is integral to the Debtor's ability to successfully transition into chapter 11. As described above, any lapse in payment of Compensation Obligations or Employee Benefit Obligations could subject the Debtor to significant disruption in or a potential cessation of the Debtor's business, and loss of the value of the Debtor's assets, thereby causing immediate and irreparable harm to the Debtor's estate and, consequently, other interested parties. Accordingly, the Debtor submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

39. To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a)(1) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise for all of the reasons described above.

## RESERVATION OF RIGHTS

40. Nothing contained herein or in the Proposed Orders is intended or shall be construed as: (i) an admission as to the validity, amount or priority of any claim against the

18

Debtor; (ii) a waiver of the Debtor's rights to dispute any claim; (iii) a promise or requirement to pay any claim; (iv) a waiver of any claim or cause of action of the Debtor that exists against any entity; (v) a ratification or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code; (vi) a waiver of limitation of the Debtor's rights under the Bankruptcy Code, any other applicable law, or any agreement; or (vii) an admission or concession by the Debtor that any lien acknowledged or satisfied under this Motion is valid, and the Debtor expressly reserves and preserves its rights to contest the extent, validity, or perfection, or seek avoidance of, any such lien.

## NOTICE

41.    Notice of this Motion will be provided to: (a) the Office of the United States Trustee, Attn: Jonathan Lipshie (jon.lipshie@usdoj.gov); (b) the Internal Revenue Service; (c) Wex Health; (d) United Healthcare; (e) Empower; (f) the parties included on the Debtor's list of its thirty (30) largest unsecured creditors; (g) the United States Attorney's Office for the District of Delaware; (h) the Securities and Exchange Commission; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking first-day relief, the Debtor will serve copies of this Motion and any order entered in respect of this Motion as required by Local Rule 9013-1(m). The Debtor respectfully submits that no further notice of this Motion is required under the circumstances.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter the Proposed Orders, granting the relief requested in this Motion, and such other and further relief as the Court may deem just and appropriate.

Dated: April 16, 2026          **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
      Wilmington, Delaware

*/s/ Jonathan M. Weyand*
Curtis S. Miller (No. 4583)
Andrew R. Remming (No. 5120)
Jonathan M. Weyand (No. 6959)
Brianna N. V. Turner (No. 7468)
Autumn K. Mueller (No. 7633)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Email: cmiller@morrisnichols.com
      aremming@morrisnichols.com
      jweyand@morrisnichols.com
      bturner@morrisnichols.com
      amueller@morrisnichols.com

*Proposed Counsel to the Debtor and Debtor in Possession*